UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

J.J.B. HILLIARD, W.L. LYONS, INC.,
                    Plaintiff,

                                                    Case No. 1:07-cv-811

-v-
                                                    HONORABLE PAUL L. MALONEY

KEVIN H. CLARK, CARLA A. MASSELINK
BRYAN ZICHTERMAN, DANIEL M.
KLEINHEKSEL, MARK L. ZICHTERMAN,
THOMAS BOSCH, SARAH CLARK, DAWN
PHILLIPS, TINA JUNIOR, JILL KONING,
KATHY MUOIO and the LAKESHORE GROUP,
                    Defendants.


<u>OPINION SUPPORTING ORDER GRANTING IN PART PLAINTIFF'S MOTION FOR
PRELIMINARY INJUNCTION</u>

        This matter is before the Court on Plaintiff's Motion for a Preliminary Injunction filed under

Fed. R. Civ. P. 65.

        Plaintiff Hilliard-Lyons is a financial services firm incorporated in Kentucky and authorized

to business in Michigan.  Defendants, other than the Lakeshore Group, are all former employees of

Plaintiff's Holland, Michigan office.  Defendants left Plaintiff en masse  for Raymond James &

Associates (RJA), a competitor of Hilliard-Lyons on August 10, 2007.  Defendants took information

with them about investors in both paper and electronic form.  On Monday, August 20, 2007, Plaintiff

filed a complaint alleging conversion, breach of contract, breach of fiduciary duty, misappropriation

of trade secrets, tortious interference with contractual relations, and unfair competition.  Plaintiff

also filed a motion for a temporary restraining order and for a preliminary injunction.

        The day  the complaint and motion were filed, the Magistrate Judge issued a broad temporary

restraining order enjoining Defendants generally from soliciting or contacting the individuals whose

accounts they serviced and further enjoining them from working for a competitor of Hilliard-Lyons in Ottawa County or in a contiguous county.  On August 21, Defendants filed a motion to dissolve the TRO.  The Magistrate Judge heard arguments on August 22 and issued a revised temporary restraining order narrowing the scope of the injunction and specifically eliminating the portion preventing Defendants from working in Ottawa County or a contiguous county.  On August 28, this Court heard argument on the motion.  This Court has carefully considered counsel's presentations, the briefs and voluminous exhibits attached as well as the depositions and additional exhibits submitted at the hearing. This Court concludes a limited preliminary injunction is warranted.

I.  BACKGROUND

Defendants allege to have been unhappy with their current arrangements with Hilliard-Lyons for some time.  Defendants admit that they have been in discussions with various competitors of Plaintiff about moving their business as far back as 2005.  In the second half of 2006, several Defendants traveled to Florida to meet representatives of RJA at that firm's national headquarters. Defendants initially decided to leave Plaintiff in April or May of 2007, but due to staffing problems abandoned their plans.  Defendants cannot recall when they decided to leave the second time.[1] Defendants were adamant that the timing of their resignations had nothing to do with the fact that their branch manager was leaving for two weeks on  vacation out of the country.  The Court finds those assertions incredible.

On Friday, August 10, 2007, between 3:30 and 4:30 p.m. Kevin Clark, Carla Masselink,

---

[1]Plaintiff deposed Kevin Clark, Carla Masselink, Bryan Zichterman and Dan Klienheksel on August 27 in preparation for the hearing on the preliminary injunction.  The deposition transcripts reveal that Defendants collectively appear to have amnesia regarding much of the details concerning the move which undoubtedly involved more than an insignificant amount of their time over the last few months.

Bryan Zichterman, Dan Kleinheksel, Mark Zichterman, and Tom Bosch tendered their resignations. The resignations were form letters, effective immediately, and referred any questions of a legal nature to Attorney Ray Henney. Defendants left the office and went to their new office just down the street. RJA had already outfitted the new office with desks, computers, file cabinets, and telephone lines. There were representatives from RJA in the new office when Defendants arrived.

Soon thereafter, Defendants initiated contact with those individuals whose accounts they had been servicing. Kevin Clark and Carla Masselink sent their clients[2] a letter announcing the move and packages of information with transfer forms specifically tailored to the clients' accounts. The forms were prepared in advance with the clients' names and addresses already filled in, the type of account that client had with Plaintiff and what type of account should be created with RJA. Those forms were prepared by RJA using information supplied by someone associated with Defendants.[3] Bryan Zichterman did not send his clients any transfer forms, only a letter announcing his move to RJA. After the various mailings were taken to the post office, Defendants began calling their clients, informing them of the move. Defendants made calls that Friday until 8:00 or 9:00 p.m. and returned Saturday morning to do continue making telephone calls. Clients began arriving to complete transfer forms Friday evening.

The two TROs have limited Defendants' ability to call clients, but most, if not all, clients had

---

[2]This Court will use the possessive pronouns for convenience and is not a conclusion that the customers belong to either the Defendants or Plaintiff.

[3]This is one of the many details that was difficult for the Defendants who were deposed to recall. The four Defendants who were deposed each deny supplying the information to RJA or ordering someone to supply the information and do not know who, or even if, another one of Defendants provided the information to RJA. In her affidavit, attached as Exhibit B to Defendants' Motion to Dissolve the TRO, Ms. Masselink admits she provided RJA with a list of her client's names, addresses, telephone numbers and account types.

already been contacted in one form or another by August 20.  The initial TRO enjoined Defendants from soliciting clients and from working for a competitor of Plaintiff in Ottawa County or a contiguous county.  After receiving copies of the first TRO, Kevin Clark, Carla Masselink, Bryan Zichterman and Dan Kleinheksel drove to Kalamazoo, which is not in a county contiguous to Ottawa, and checked into rooms at the Radisson where they returned calls to clients who had previously contacted Defendants.  When the second TRO was issued on August 22, Defendants moved back to their new Holland office and continued to return calls to those individuals who called them.

## II.  STANDARD FOR A PRELIMINARY INJUNCTION

Plaintiff's amended complaint requests an order directing Defendants to return confidential and proprietary business records and client files and an injunction prohibiting Defendants from using the confidential information, contacting the clients in violation of non-solicitation agreements and enforcing the non-competition agreements.  A district court has discretion to grant or deny preliminary injunctions.  *Warshak v. United States*, 490 F.3d 455, 465 (6th Cir. 2007).  When deciding a motion for a preliminary injunction, a court should consider and balance four factors: (1) whether the plaintiff has established a substantial likelihood or probability of success on the merits; (2) whether there is a threat of irreparable harm to the plaintiff; (3) whether issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by granting injunctive relief.  *Id.* (quoting *Nightclubs, Inc. v. City of Paducah*, 202 F.3d 884, 888 (6th Cir. 2000) (overruled on other grounds, *City of Littleton v. Z.J. Gifts D-F, L.L.C.,* 541 U.S. 774, 784 (2004)).  The four factors are not prerequisites that must be established at the outset, but are interconnected considerations that must be balanced together.  *Coal. to Defend Affirmative*

4

*Action v Granholm*, 473 F.3d 237, 244 (6th Cir. 2006).  The purpose of a preliminary injunction is to preserve the status quo.  *Smith Wholesale Co., Inc. v. R.J.R. Tobacco*, 477 F.3d 854, 873 n. 13 (6th Cir. 2007) (quoting *U.S. v. Edward Rose & Sons*, 384 F.3d 258, 261 (6th Cir. 2004)).

A.  Likelihood of Success on the Merits

Plaintiff relies on three different documents signed by Defendants in the allegations in the complaint: (1) a Revenue Sharing Agreement (RSA) (Exhibit 1 to Complaint), (2) Investment Broker Trainee Agreements (Trainee Agreement) (Exhibits 2-6 to Complaint), and (3) PNC's[4] Code of Business Conduct (Code) (Exhibit D to Plaintiff's Brief In Support of Preliminary Injunction). As discussed at oral argument and reflected in the amended complaint, Plaintiff acknowledges that it cannot rely on the RSA signed on December 6, 2006.  Plaintiff is not a party to the RSA.  For the same reason, Defendants cannot use the RSA to argue Plaintiff approved of the language or provisions in it.  Although Plaintiff may have been aware that Defendants were creating the agreement, the witness signatures do not indicate those persons associated with Plaintiff signed in their official capacity.

The Code contains a privacy and confidentiality statement in Section E.  It begins "[a]s an employee of PNC, you are expected to protect PNC Confidential Information from unauthorized access and disclosure and use it only as directed, for the benefit of PNC."  That section contains an overview under the title "Safeguarding Confidential Information."  It states

Confidentiality is a fundamental principle at PNC.  While employed by PNC, you may learn of or have access to information about PNC and/or its consumers, clients, shareholders, directors, employees and suppliers.  You should assume all information

_____

[4]According to the corporate disclosure statement, PNC Financial Services Group, Inc. is the parent corporation of PNC H.L. Holding Corp. which is the parent company of Hilliard-Lyons.

5

learned on the job is Confidential Information. You must use Confidential Information only for legitimate business purposes and prevent its unauthorized disclosure.

Basic Rules
    ...
    •Never use Confidential Information for personal financial gain or to compete with PNC.
    ...
    •Do not disclose Confidential Information, even after you leave your employment or position with PNC.

The Trainee Agreement contains restrictions and covenants. The second full paragraph on

the first page of the agreement states

    1.   In the event I voluntarily terminate my employment, provoke my termination, or I am terminated for cause at any time prior to a date three years after the date of my employment, I agree to reimburse Hilliard-Lyons for expenses incurred by it and value received by me during my training period and subsequent employment up to terminations. Such expenses may include...
    ...
    The full amount thereof shall be fully paid by me to Hilliard-Lyons if such termination of employment occurs at any time prior to a date one year after the date of employment. My obligation to repay shall be reduced by one twenty-fourth (1/24) of such total for each full month that I am employed by Hilliard-Lyons subsequent to one full year of employment, so that after three full years of employment, I will have no obligation under this Paragraph.

The Trainee Agreement also includes noncompete and nonsolicitation clauses, a statement regarding

confidential information and a statement explaining the consequences of violating any of those

clauses. The noncompete and nonsolicitation clause states

    2.   For a period of one year from the date of termination of my employment with Hilliard-Lyons at any time and for any reason whatsoever, I will not solicit investment business from any client of Hilliard-Lyons whom I served or whose name became know to me while I was employed by Hilliard-Lyons; nor will I contact such clients to advise them I have secured employment with another brokerage or advise, suggest or invite such clients to transfer their accounts or do business with that brokerage firm. I further agree that for a period of six months after termination of my employment with Hilliard-Lyons at any time and for any reason whatsoever, I will not in the county in which the Hilliard-Lyons office where I am or was

6

employed, or any county contiguous thereto, either solicit investment business from any party or work for or in any manner assist a competitor of Hilliard-Lyons.

The confidential records clause states

> 3. I understand and agree that any and all records and files of Hilliard-Lyons and all copies thereof, including the names and addresses of its clients, are, and shall remain, the confidential property of Hilliard-Lyons at all times, both during my employment and after termination of my employment for any reason whatsoever. None of such records nor any part of them is to be removed from Hilliard-Lyons premises either in original form or in duplicated or copied form.  It is expressly agreed and understood that this applies to clients assigned to me by Hilliard-Lyons and also to clients which I may obtain in the employment of Hilliard-Lyons.

Finally, the implications of violating those clauses are outlined in the following statement.

> 4. I understand that if the provisions of paragraph 2 or 3 are violated by me, Hilliard-Lyons will suffer irreparable harm and accordingly will be entitled to injunctive relief enforcing this provision.  I consent to the issuance of a temporary restraining order or a preliminary or permanent injunction to prohibit the breach of any provision of this contract, or to maintain the status quo pending the outcome of any arbitration proceeding which may be initiated.  In addition, I will be liable to Hilliard-Lyons for any and all damages caused thereby.

Paragraph 6 of the agreement is a choice of law provision stating that the agreement shall be governed by the laws of Kentucky.  Paragraph 8 of the agreement is a merger clause and states "I understand that Hilliard-Lyons is relying on the representations and agreements evidenced herein and that this agreement incorporates the entire understanding between me and Hilliard-Lyons on the subject matters herein and may not be changed except in writing signed by a duly authorized officer of Hilliard-Lyons and myself."

For the purpose of this section, Defendants fall into three categories.  Defendants Kevin Clark and Carla Masselink are brokers with clients and both signed the Code.  Defendants Bryan Zichterman, Dan Kleinheksel, Mark Zichterman Tom Bosch, and Sarah Clark signed both the Code and the Trainee Agreement.  The parties dispute whether Sarah Clark has worked as a broker within

the last year.  Finally, Defendants Dawn Phillips, Tina Junior, Jill Koning, and Kathy Muoio are sales assistants who do not have their own clients and who signed the Code.

With regard to the five individuals who signed the Trainee Agreements, this Court finds Plaintiff has a substantial likelihood of success on the merits.  The Trainee Agreement contains an unambiguous, one year nonsolicitation provision and a noncompete provision that lasts six months. The Trainee Agreement further contains a statement that all records and files are the confidential property of Hilliard-Lyons and that no part of that information may be taken.  The confidentiality statement explicitly applies to clients assigned to the trainee by Hilliard-Lyons and clients the trainee obtains while working at Hilliard-Lyons.

Defendants' arguments against enforcing the Trainee Agreement are unpersuasive. Defendants argue the agreement expired after three years.  The three year provision applies only to the requirement that a trainee reimburse Hilliard-Lyons for the expenses incurred and does not apply to the other provisions in the agreement.  Defendants assert they were told by branch managers after three years they would be free agents and the agreement no longer applied.  Even if true, it is not clear on this record that the branch managers were referring to the entire agreement or just the portion regarding reimbursement.  In addition, and more importantly, the Trainee Agreement contains a merger clause  requiring changes in the agreement to be in writing and signed by an authorized member of Hilliard-Lyons.  This Court is unaware of any authorized change to the agreement.

Defendants argue the Trainee Agreement is ambiguous and should be interpreted against Hilliard-Lyons.  The Training Agreement is not ambiguous.  The introductory paragraph states the trainee agrees to the following conditions.  That introductory overview paragraph does not include

8

any timeline or indication that the enumerated conditions are subject to time sensitive deadlines. The first condition is to repay Plaintiff for costs and expenses of training if the trainee leaves within three years. There are two paragraphs which begin with an arabic number one. Both paragraphs numbered "1" relate to the repayment of expenses. Paragraph "2" contains the nonsolicitation and noncompete clause. Nothing under the paragraphs discussing the three year reimbursement provision suggests that it applies to the other enumerated conditions. The second condition includes separate timelines. The nonsolicitation provision lasts for one year. The noncompete provision lasts for six months. The third condition, which is the confidentiality provision, does not contain any time limitation.

Defendants argue the Trainee Agreement is overbroad, unfair and fails to protect any legitimate business interest of the Plaintiff. Under Kentucky law, restrictive covenants will be upheld as reasonable if, under the circumstances of the particular case, the restriction affords fair protection to the interests of he covenantee and is not so restrictive as to interfere with the public interest nor imposes undue hardship on the party restricted. *Central Adjustment Bureau, Inc. v. Ingram Assoc., Inc.,* 622 S.W.2d 681, 685 (Ky. Ct. App. 1981). Contrary to Defendants' assertion, the nonsolicitation provision in the Trainee Agreement is not overly restrictive. The nonsolicitation provision expressly applies to clients assigned by Plaintiff or obtained by Defendants while working at Hilliard-Lyons. The nonsolicitation provision does not expressly apply to clients brought to Hilliard-Lyons by a broker from the broker's prior place of employment. This interpretation makes sense given that the Agreement is for Trainees rather than for experienced brokers. In addition, the nonsolicitation provision lasts only twelve months, allowing a trainee who leaves Hilliard-Lyons to solicit business from former clients after one year.

Defendants also argue the nonsolicitation provision should not be enforced because it is inconsistent with the "Protocol for Broker Recruiting."  (Exhibit M to Defendant's Brief in Opposition to Preliminary Injunction).  Defendants argues the Protocol was signed by a majority of brokerage firms in 2004.  Defendants point to one case involving departing brokers where the Court held Plaintiff could not establish irreparable injury because it signed the Protocol.  *See Merrill Lynch, Pierce, Fenner, & Smith, Inc. v. Brennan*, 1:07-cv-475, 2007 WL 632904 (N.D. Ohio, Feb. 23, 2007).  The Protocol applies, by its own terms, when brokers "move from one firm to another and both firms are signatories to this protocol."  The Protocol permits brokers to take client names, addresses, phone numbers, email addresses, and account titles of clients who they serviced while at the firm, but prohibits taking any other documents or information.  The Protocol further provides that "it shall not be a violation of this protocol for [a broker], prior to his or her resignation, to provide another firm with information relating to the [broker's] business, other than account statements, so long as that information does not reveal the client identity."  The President of RJA signed the Protocol in July 2006.  Hilliard-Lyons has not signed the Protocol, making the case at bar readily distinguishable.

*Brennan* is also distinguishable from the situation here.  The district court noted Plaintiff in *Brennan*, Merrill Lynch, signed the Protocol even though the firm to which Mr. Brennan went to had not signed it.  *Id.* at *2.  The district court concluded, by signing the protocol,  Merrill Lynch "tacitly accepts" that brokers may take certain client information with them when they leave for another firm and that such action does not cause irreparable harm.  *Id.*  Nothing in the record demonstrates Plaintiff's tacit acceptance of that its brokers might quit, take information, and begin competing against Hilliard-Lyons.  Hilliard-Lyons did not sign the Protocol.  Defendants argue the

10

Protocol is evidence of the industry standard. This Court disagrees. By its own terms, the Protocol applies only to those firms who sign it. In addition, the Protocol includes an opt-out provision. "A signatory who has withdrawn from the protocol shall cease to be bound by the protocol and the protocol shall be of no further force or effect with respect to the signatory." By the clear and unambiguous terms of the Protocol, it is not intended to bind those firms who opt not to sign it.

Defendants argue the noncompete clause in the Trainee Agreement is overly restrictive. The noncompete clause prohibits a departing employee from working for a competitor of Hilliard-Lyons and from soliciting clients in Ottawa County, Allegan County, Muskegon County, and Kent County for six months after leaving Hilliard-Lyons. This clause is not unreasonable under Kentucky law. The clause is of limited duration and geography. The clause does not prevent a departing employee from earning a living in the industry.

The three cases cited by Defendants are easily distinguishable from the situation before this Court. In *Vencor, Inc. v. Webb*, 33 F.3d 840 (7th Cir. 1994), defendant signed a confidential information and a noncompete agreement. The noncompete clause extended to the entire continental United States and prohibited employees from working for other long-term care hospitals for chronically ill patients for twelve months. *Id.* at 843. The court held that the covenant not to compete was unreasonable because defendant had not disclosed any confidential information to his new employer and had no use for the information in his new, and significantly different, position. *Id.* at 845-846. Here Defendants took the identities of their clients, contact information and account types which they used to solicit the clients to transfer accounts. In addition, Defendants took substantially similar if not identical positions of employment with a competitor of Hilliard-Lyons.

The covenant not to compete in *Gardner Denver* prohibited defendant from working, in any

11

capacity, for any business which competed with plaintiff, for a period of three years. *Gardner Denver Drum LLC v. Goodier*, 3:06-cv-4-H, 2006 WL 1005161 (W.D. Ky. April 14, 2006). The court found the duration and geographic restrictions reasonable for the purpose of a preliminary injunction. *Id.* at \*8. Defendants reference the portion of the opinion where the court acknowledges the restriction on working for a competitor would be unreasonable if the new job did not involve actual competition.[5] The rest of the paragraph, however, provides support for the conclusion that the covenant in the case and before this Court are reasonable. The court stated

> [h]owever, such is not the case here. Goodier has taken a management level position with a direct competitor of Drum and is admittedly still engaging in work relating to the transportation industry at least ten percent of the time. This ten percent is certainly "competition" of some sort under any reasonable interpretation of the term. *Id.* at 9.

The holding in *Orion Broadcasting, Inc. v. Forsythe*, 477 F.Supp. 198 (W.D. Ky. 1979) does not help Defendants. In *Forsythe*, defendant was terminated as a news anchor by plaintiff. The covenant not to compete prohibited defendant from working, for twelve months, for another area radio or television station. *Id.* at 198. The court found the covenant unreasonable because there was no national market for news anchors and because plaintiff, not defendant, initiated the separation. *Id.* at 201. The court concluded the covenant functionally deprived defendant of her livelihood. *Id.* The significant facts on which the *Forsythe* court relied are not present in the case before this Court. Defendants, not Plaintiff initiated the separation. This Court has not been presented with any information regarding the local or national market for brokers.

Defendants argue the restrictive covenants cannot be enforced because they violate FINRA

---

[5]In the hypothetical situation presented in the opinion, defendant accepts a job working in the mail room of a competitor.

(formerly NASD) rules.  Specifically, Defendants point to Rule 11870 and IM-2110-7.  Rule 11870 and the interpretive material generally governs the ability of customers to transfer accounts between brokers and requires registered members to expedite and coordinate transfers of accounts when requested by customers.  The Rule does not affect the ability of a securities firm to use employment agreements to prevent former employees from soliciting firm customers.  *Charles Schwab & Co., Inc. v. Karpiak*, 06-4010, 2007 WL 136473 n. 8 at *13(E.D. Pa., Jan. 12 2007).  The Rule is inconsistent with strict enforcement of the noncompete clause.

This Court finds Plaintiff has established a likelihood of success on the merit against Brian Zichterman, Dan Kleinheksel, Mark Zichterman, Tom Bosch and Sarah Clark.  All five signed Trainee Agreements which contain reasonable nonsolicitation and noncompete clauses.  Those five individuals are enjoined from soliciting customers who were assigned by Plaintiff to them and from soliciting customers who they obtained while working for Plaintiff.  These Defendants may accept transfers of accounts from clients who were assigned by Plaintiff and from clients they obtained while working for Plaintiff.  However, these five defendants may not initiate contact with such clients.  These Defendants are not enjoined from working in Ottawa or the contiguous counties as such an injunction would unduly interfere with a client selecting the broker of his or her choice and would be contrary to FINRA rules.  These Defendants will return any client records to Plaintiff who have not already (as of August 31, 2007 at the time of entry of this Court's order) requested transfer of his/her account from Plaintiff.

Turning to Kevin Clark and Carla Masselink, these individuals brought clients with them to Hilliard-Lyons and did not sign the Trainee Agreements.  Plaintiff must necessarily rely on the Code

Clark and Masselink acknowledged receiving and agreed to abide by.[6]  Unfortunately, this Court has not been provided with the entire Code.  It is unclear if the Code defines "confidential information."  The portion of the Code that has been provided indicates employees may have access to information about PNC or its clients and that employees should assume all such information to be confidential.   This Court is not convinced that all information Clark and Masselink had access to was confidential information.  Clark and Masselink brought information about the clients they had before working at Hilliard-Lyons to Plaintiff.  Plaintiff has not established that the information brought by Clark and Masselink is confidential information.  Other courts confronted with similar situations have concluded customer lists and client information, to some extent, are not protected information.  In *Raymond James & Assoc. v. Leonard & Co.*, 411 F.Supp.2d 689 (E.D. Mich. 2006), plaintiff relied on a confidentiality statement that was part of the corporate policy defendant agreed to abide by because defendant did not sign any nonsolicitation or noncompete agreements.  The court found Plaintiff could not establish the client information a departing broker took with him was a protected trade secret because RJA allowed defendant to maintain "posting pages" which contained the same information *Id.* at 694 and which RJA had acknowledged were defendant's property.  *Id.* at 692.

Client lists have been held to be confidential information in situations where brokers leave one firm for another.  *See Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Ran*, 67 F.Supp.2d 764 (E.D. Mich. 1999).  In *Ran*, defendant signed a detailed nondisclosure statement which stated that

---

[6]At oral argument, Defendants alleged Kevin Clark sent a letter along with his acknowledgment of the Code in which he explained that he understood the clients and their information to be his, not PNCs.  The parties have not provided this Court with the letter.  The letter is discussed on page 73 of Mr. Clark's deposition. On the same page, Mr. Clark asserts he repeatedly addressed this issue with management who assured him that the clients were his.

all records, including the name and addresses of clients are the property of Merrill Lynch and that no part of the record could be removed from the premises of Merrill Lynch. *Id.* at 768. The court rejected defendant's argument that he brought clients with him when he started at Merrill Lynch. *Id.* at 775. The confidential information statement in the Code is not as specific or as detailed as the one signed in *Ran*.

This Court finds Plaintiff has not established a likelihood of success against Kevin Clark and Carla Masselink. With regard to the clients Mr. Clark and Ms. Masselink brought with them to Hilliard-Lyons, information such as names, addresses, telephone numbers and account types are not protected, confidential information under the terms of the Code. The information about clients Mr. Clark and Ms. Masselink obtained while working for Plaintiff is less clear. Given the statements of management in response to Mr. Clark's inquiries about the Code[7] and its impact on the information about his clients, this Court concludes Mr. Clark and Ms. Masselink are not enjoined from taking the same information about clients who were obtained while working for Plaintiff. The portions of the Code provided to this Court do not explicitly prohibit taking that information, only disclosing it. Mr. Clark and Ms. Masselink may not use the information to compete with PNC however. Because Defendants questioned whether the clause would prevent competition with Hilliard-Lyons at oral argument, this Court clarifies that the information may not be used to compete with Hilliard-Lyons, a subsidiary of PNC such that competition with PNC's investment interests would be competition with Hilliard-Lyons.

A similar conclusion is warranted for Defendants Dawn Phillips, Tina Junior, Jill Koning and Kathy Muoio. Each of these Defendants agreed to abide by the Code and may not use any

---

[7]See footnote 6.

15

confidential information to compete with PNC. Because these individuals were not brokers and therefore could not allege the clients were theirs, these Defendants are enjoined from taking, disclosing or confidential information about clients of Plaintiff or using that confidential information to compete with Plaintiff.

B. Irreparable Harm

Plaintiff has likely established irreparable harm. A preliminary injunction should not be entered where money damages would make the aggrieved party whole. *Performance Unlimited, Inc. v. Questar Publishers, Inc.*, 52 F.3d 1373, 1382 (6th Cir. 1995). The loss of customer goodwill may amount to irreparable injury because the damages flowing from such losses are difficult to compute. *Basicomputer Corp. v. Scott*, 973 F.2d 507, 512 (6th Cir. 1992). In addition, the loss of fair competition resulting from the breach of a non-compete clause may also amount to irreparable harm to the employer. *Id.* In *Ran*, the court entered a preliminary injunction after four stockbrokers resigned from Plaintiff and joined a competitor. 67 F.Supp.2d 764. In concluding that Plaintiff established irreparable harm, the court found there was no way to calculate how much the various client portfolios might have grown if they were not transferred, what assets the clients may have earned, inherited or won over time, or what potential referrals transferring clients might have made. *Id.* at 779.

C. Harm to Others

Defendants are correct that a broad injunction would negatively impact their ability to serve clients who wish to transfer accounts. The appropriate balance of interests is found by protecting the interests outlined in the Trainee Agreement and in the Code. Prohibiting Defendants Bryan and Mark Zichterman, Dan Kleinheksel, Tom Bosch and Sarah Clark from soliciting their clients to

16

transfer accounts may negatively impact their book of business, however, those Defendant's agreed to such a consequence when they signed the Trainee Agreement. The same is true for the prohibition on Defendants Clark and Masserlink from using information about clients obtained when in the employ of Plaintiff under the terms of the Code. Plaintiff clearly has a legitimate interest in preventing competition from departing employees when those employees use information gathered while they were still working for Hilliard-Lyons. Defendants' interest in luring those clients away does not overcome Plaintiff's interest in light of the terms of employment as expressed in the various documents.

D. Impact on the Public.

The public has an interest in the freedom to select a broker. The public also has an interest in the enforcement of contracts. *Ran*, 67 F.Supp.2d at 781. When a broker has an employment contract with restrictive covenants, terminates his or her employment and violates those covenants, neither interest of the public is served. The injunction may interfere, to a limited extent, with the interest a particular client has in doing business with a particular broker. However, the expedited arbitration process required by FINRA Rules minimizes that impact.

E. Unclean Hands

Defendants argue this Court should not provide equitable relief because Plaintiff has unclean hands. First, Defendants argue Plaintiff recruited Mr. Clark and Ms. Masselink in the same manner in which RJA recruited Defendants. Defendants have not established Mr. Clark or Ms. Masselink signed noncompete or nonsolicitation agreement when they were with their prior employer. Neither have Defendants established that Plaintiff continues to use the same tactics they used fifteen years ago when Mr. Clark and Ms. Masselink were recruited. Although Defendants represent that this

17

practice is industry standard[8], this Court is unwilling to "throw in the towel" and sanction wanton

breaches of reasonable contractual terms.  This Court finds persuasive the language in Judge Steeh's

opinion in *Ran.*

> Although this unfortunate conduct appears to be quite rampant in the industry
> as a whole and is undeniably placing a certain, most likely avoidable burden on
> federal courts, Merrill Lynch's decision to encourage brokers from other firms to join
> them and to engage in conduct which violates those brokers' employment contracts
> with competing firms, even if true, is irrelevant to the instant dispute.  Such an
> offensive industry practice is not grounds for refusing to enforce the valid restrictive
> covenants at issue here, however distasteful the court finds the untoward business
> practice of the brokerage firms.  67 F.Supp.2d at 776.

Defendants other argument regarding unclean hands do not undermine this Court's decision

to issue in injunction.  The fact that Plaintiff initially relied on the RSA was corrected by the revised

TRO.  Indeed, one purpose of the court rule allowing motions to dissolve ex parte TROs is precisely

such an event.  Defendants argue Plaintiff had a deliberate plan to mislead trainees about the

duration of the agreement.  The evidence presented in the affidavits and depositions does not support

that conclusion.

## III.  CONCLUSION

The balance of factors favors granting a limited preliminary injunction in this case.  Plaintiff

has a legitimate business interest in preventing its former employees from soliciting clients using

the information those employees obtained while working for Plaintiff.  With the exception of the

geographic limitations, the terms of the restrictive covenants in the Trainee Agreement are

reasonable.  Plaintiff does not have a similar interest in the information about clients brought to

Hilliard-Lyons by Mr. Clark and Ms. Masselink when those Defendants joined the firm.  The Code

---

[8]See *H&R Block Fin. Advisors, Inc. v. Majkowski*, 410 F.Supp2d 1 (D.D.C. 2006).

does not expressly identify information about those clients as confidential information that cannot

be disclosed or used to compete against Plaintiff.  The specifics of the preliminary injunction are

detailed in the accompanying order.


Date:   <u>August 31, 2007</u>                                          <u>/s/ Paul L. Maloney           </u>
                                                                                      Paul L. Maloney
                                                                                      United States District Judge

19